IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES W. CAMPBELL,

               Petitioner,

         v.

DANIEL PARAMO,[1] Warden, Richard J. Donovan Correctional Facility,

               Respondent.

No. 2:10-cv-0114-JKS

MEMORANDUM DECISION

James W. Campbell, a state prisoner proceeding through counsel, filed a Petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Campbell is currently in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at the Richard J. Donovan Correctional Facility. Respondent has answered, and Campbell has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

The Court of Appeal summarized the factual background of the case as follows:

*Guilt phase*

1. *The prosecution*
      At the time of the offense, [Campbell] lived at a Stockton residence with his girlfriend, Debra; Debra's father, Therman; Debra's two sons, Scott and Eric; Debra's sister, Pam; Pam's husband, Larry (the victim); and Pam and Larry's six children, Tiffany, Katie, Larry, Andrew, Tina, and Andrea. For the sake of clarity, we refer to these family witnesses by their first names.
      On the day before the killing, [Campbell] and the victim fought each other. [Campbell] gave the victim a black eye.
      The following day, January 5, 2003, Debra and Katie were visiting a friend who lived down the street. Pam was also away visiting with a friend. Larry was watching a

_____

[1]    Daniel Paramo, Warden, Richard J. Donovan Correctional Facility, is substituted for Francisco Jacquez, former Warden, Pelican Bay State Prison. FED. R. CIV. P. 25(c).

football game on television in his upstairs bedroom.  Therman was also watching TV in his own bedroom.  [Campbell] was fixing the living room door.  [Campbell] asked Andrew to get him a hammer and a hatchet.  Andrew found a hammer outside and brought it to [Campbell], but he did not find a hatchet.  [Campbell] went outside, found something, and picked it up.

[Campbell] then told Andrew and Andrew's two younger sisters that he loved them.  He started to cry.  He hugged them, told them to play in the yard, and walked back into the house.  Andrew and his sisters, however, followed [Campbell] into the house and hid behind the living room couch.

[Campbell] walked upstairs into Larry's bedroom.  Andrew followed him halfway up the stairs.  Andrew heard his father say to [Campbell], "What are you going to do with that, bro, chop me up?"  Andrew then saw [Campbell] hit his father with a hatchet on the left side of his father's head.  He ran downstairs to get his grandfather.

Andrew and Therman went over to the stairway.  [Campbell] was standing on the stairs; the victim was next to him, sitting down, and not moving.  [Campbell] said, "I didn't hurt your dad."  Therman told Andrew and his sisters to get into the car, and they drove to pick up Debra and Katie.

When they returned, Katie jumped out of the car and ran into the house.  She saw [Campbell] in the kitchen standing over the victim, who was lying on his back in a big puddle of blood.  [Campbell] was holding the victim's legs.  Katie asked [Campbell] what he had done, and then ran outside screaming and crying, passing Debra.  Debra asked what was wrong.  Katie replied, "He killed my dad."

Inside, [Campbell] walked out of the kitchen and into the living room.  Debra stopped him and asked, "James, what have you done?"  [Campbell] replied, "I did what had to be done."  [Campbell] continued outside while Debra went into the kitchen.  She squatted down, and as she shook the victim, she noticed his hands had been severed.  Debra went back outside and flagged down a passing police car on routine patrol.  She told the officer, "My brother, he's dead, he's in the house."

The officer, California Highway Patrol Officer Mark Petricevich, stepped out of his car to speak with Debra, Katie, and [Campbell].  [Campbell] had blood on his hands.  He told Officer Petricevich he had tried to help the victim.  He also stated he had seen the suspect run away from the house.  He described the suspect as a White male with shoulder-length dark hair and blue eyes.  Officer Petricevich radioed for help, but San Joaquin County sheriff's deputies were already on their way, having been dispatched to the house in response to a call that a man was chasing another man with an ax.

Upon arriving at the scene, Deputy Sheriff Richard Tellyer noticed [Campbell] matched the description of the suspect he had been given.  He and his partner drew their weapons and ordered [Campbell] to get down on his knees, and then onto his stomach, so they could handcuff him.  [Campbell] dropped to one knee, but refused to get down onto both knees.  Deputy Tellyer attempted to put him in a wrist or arm lock, but [Campbell] resisted, pushing backwards with his arms and yelling.

Deputy Tellyer's partner, Deputy Charles Locke, tried using a taser on [Campbell], who was now standing, but it had no effect.  The deputies continued commanding [Campbell] to get down but he continued to refuse, yelling, "I didn't do it."  Deputy Locke

fired the taser gun several more times, but it still had no effect on [Campbell].  Deputy Tellyer struck [Campbell] several times in his knee with a baton, but that also had no effect.  By then, several deputies had arrived and, by using their collective body weight, successfully wrestled [Campbell] to the ground.  [Campbell], though, continued to struggle.  Deputy Tellyer pepper sprayed him, and that had no effect.

It eventually took six or seven peace officers to subdue [Campbell].  They handcuffed him and placed him in a patrol car.  While he was being moved, [Campbell], laughing, stated, "I did it," and "Jesus told me to do it."  He yelled, "I had to do it.  I had to clean up the neighborhood."

While being transported, [Campbell] intermittently made statements that were recorded.  His statements included: "Did you catch that son of a bitch who walked out the door?"  "Caught him in the house.  Everybody just showed up.  It was crazy."  "I didn't do it.  The only reason I got blood on my hands is [I] tried to pick him up."  "I ran in there.  Oh my God.  I tried getting him downstairs.  Oh Jesus."  "Nobody seen shit.  There wasn't nobody here except me and that guy I was trying to chase, a dude with black hair and blue eyes."  "I want to see my mama."  "Let me see.  How about the times when Robert Campbell molested me?  You want to hear that too?  You want to hear it all?"

On the way to the county hospital, [Campbell] was having erratic mood swings.  He would get angry and violent, and then he would calm down.  He would clutch his fists and threaten to kill the peace officers.  In the next second, he would be crying.  The parties stipulated that the blood drawn from [Campbell] on the date of his arrest was tested and found to be free of any alcohol or drugs.

Meanwhile, peace officers entering the home found the victim lying face down on the floor in the kitchen, with a lot of blood around him.  His feet were lying on a black tarp.  His severed right hand was on the floor next to his body; his severed left hand was inside a blanket nearby.  He had large gashes on both sides of his head and on his neck.  Wet blood on the floor indicated not much time had passed since the killing.

Near the body, officers found several bloody blankets and an ax.  The ax handle near the head of the ax was covered with brownish blood-like stains.  In the upstairs bedroom, blood was on a wall and the top of a mattress, and it stained the ceiling.  It appeared the victim had been lying on the mattress with his head close to the wall when the bloodshed occurred.  The lack of blood on the victim's back indicated he had been laying face up when the attack occurred.  There was no indication of any struggle.  It also appeared the victim had been dragged down the stairs and into the kitchen.

An autopsy disclosed the victim had suffered at least two chopping blows to each side of his head and to his neck.  The wounds were very deep.  The ax pierced the skull and shattered it into the brain as well as chopped off portions of the brain.  One of the wounds to the right side of the head went into the brain stem area, which would have caused instant death.  The ultimate cause of death was "[m]ultiple chop injuries consistent with an ax."  The hands had been severed after the victim died.

2. *The defense*

[Campbell's] defense included the testimony of a neighbor, Frank Castleman; Dr. Kent Rogerson, defendant's psychiatrist; and himself.

Castleman testified that at about 1:00 or 2:00 p.m. on the day of the murder, [Campbell] visited with him at his house for a couple of hours.  [Campbell] was upset and crying.  He told Castleman he had been molested when he was younger.  He also told him he believed certain events were occurring at his home.  Describing [Campbell] at that time, Castleman said, "It just wasn't him."

A short while after the visit, Castleman saw Debra come out of her house.  She fell to her knees, screaming.  [Campbell] was already outside.  Castleman asked [Campbell] if everything was all right.  [Campbell] said it was.  Then the police arrived and fought with [Campbell].  Castleman believed the police arrived at [Campbell's] house about 15 or 20 minutes after [Campbell] left his house.

Dr. Rogerson evaluated [Campbell] and his records.  He diagnosed [Campbell] with bipolar disorder in some remission, post-traumatic stress disorder secondary to sexual and physical abuse as a child, and a personality disorder not otherwise specified. [Campbell] also had a history of methamphetamine and marijuana abuse.

Dr. Rogerson explained that bipolar disorder is a psychiatric illness where the patient's mood shifts between mania and major depression.  Under the manic phase, the patient is hyper, restless, and feels grandiose, as if he has special powers.  He may reach a delusional belief that he is God-like.  A person in a very agitated psychotic state can be dangerous.  When in a depression phase, the patient has lost all joy, feels worthless and hopeless, and begins to consider suicide.  A person with bipolar disorder goes back and forth between these two poles of mania and depression.  A person such as [Campbell] could experience abrupt shifts between mania and depression.

In response to a hypothetical question, Dr. Rogerson stated the condition of bipolar disorder would clearly have an effect on a person's ability to form intent.  Moreover, that person's ability to form intent could be affected by certain outside traumatic stressors, such as recalling having been physically or sexually abused in the past.

The manic phase of bipolar disorder does not come and go in a minute.  If it does, it is not bipolar disorder.  [Campbell's] mood did not change quickly after the homicide. [Campbell] had been increasingly ill leading up to the event.  References in records kept by the San Joaquin County Sheriff's Office Medical Unit indicated he was recognized as being very psychologically ill on the day of the homicide and for some time afterward. While at the county jail, [Campbell] was observed licking his own urine, sprinkling it as holy water, screaming, and yelling.  These symptoms of manic behavior did not settle down for a number of weeks after beginning antipsychotic medications.

Dr. Rogerson stated a person with post-traumatic stress disorder can have a sudden onset.  If something or someone precipitates a memory or recollection of an earlier trauma, the person can actually act out the trauma again or feel all of the anxiety, fear, or rage he originally felt.  This could occur, for example, when a person who was sexually abused as a child unexpectedly meets the abuser several years later.

[Campbell] told Dr. Rogerson he felt and believed at the time of the homicide that the victim was molesting his own children.  In particular, [Campbell] felt the victim had molested the victim's daughter Tiffany.

[Campbell] testified on his own behalf.  He admitted a prior conviction for spousal abuse ([California] Pen. Code, § 273.5), and admitted serving time at Deuel Vocational

Institution for violating probation.  He stated he had been molested by his uncle, Robert Campbell, when he was seven or eight years old, and again when he was 13 or 14 years old.  On New Years Day 2003, [Campbell] saw his uncle Robert at a family gathering.  Asked if that was a pleasant surprise, [Campbell] said, "[I]t wasn't too amusing."

[Campbell] said that on January 4, 2003, the day before the homicide, he was outside working on his pickup when he smelled marijuana in the air.  He found Tiffany, Eric, and their friends in the living room drinking beer.  He ran them out of the house, then headed up the stairs to tell the victim to come down and take care of his kids.  Looking in to the upstairs bedroom, he saw the victim lying on the bed exposing himself and masturbating.  The victim's young daughter, Tina, then five years old, was on the bed as well.  [Campbell] grabbed Tina, took her downstairs, and went back up.  He started to fight the victim and hit him in the eye.  The victim kept saying, "I wasn't doing nothing, brother.  I was just putting my clothes on."  [Campbell] became emotional and said, "This is what happened to me when I was a kid."

[Campbell] claimed his memory of the events of January 5, 2003, the day of the homicide, was sketchy.  He said he remembered going back to his house after visiting with Castleman.  He was in the front of the house working on a wall, and Andrew wanted to help him.  He asked Andrew to go out back and get a hammer.  At one point, they were both in the backyard, and [Campbell] grabbed the ax.  He intended to split some kindling for a wood-burning stove in the house.

Andrew asked [Campbell] if someone could hunt people with an ax.  [Campbell] said no, but that the Indians used to do it.  Andrew then looked at [Campbell], looked up to the upstairs bedroom, pointed at it, looked back at defendant, and repeated the same gestures.  [Campbell] asked Andrew, "Has he been hurting you?"  Andrew nodded yes.  FN1.

> FN1.    While being interviewed by peace officers, Andrew did not mention anything about his father hurting him or about pointing at the victim's window when [Campbell] asked him if his father was hurting him.  On the stand, Andrew said he did not remember speaking with [Campbell] about the ax while they were in the backyard except to say he did not know where the ax was.  Andrew also did not remember if before [Campbell] hugged him outside in the backyard, he looked up and pointed to the upstairs.  Kate and Tiffany, two of the victim's three children who testified, stated their father never molested them.

An overwhelming feeling came over defendant, "like a hurt, anger, rage-type feeling."  At that moment, he did not think; he just acted.  The next thing he recalled was looking down at the victim in between the kitchen and the stairway, and he was holding the ax.  His next recollection was being in the kitchen, and Pam and Debbie were screaming at him and Debbie was grabbing him.  From that point he remembered being bound in a patrol car.  He could not remember anything during the interim.

[Campbell] did not claim the things he could not remember did not occur.  "I'm just saying, like Larry's dead, I'm not saying that I didn't do it.  I just don't remember all of it, what happened."  FN2.

> FN2.   Because [Campbell] does not challenge the sanity finding, we do not discuss or refer to the evidence presented on that issue.

Campbell pled not guilty by reason of insanity.  A jury found him guilty of first degree murder and use of a deadly weapon and, following a bifurcated trial on the issue, found him sane. He was sentenced to an aggregate term of 26 years to life on April 13, 2007.

Through counsel, Campbell directly appealed, arguing that: 1) the trial court's instructions on murder improperly eliminated the differences between the degrees of murder and failed to inform the jury that his mental state defense may negate the elements of premeditation and deliberation; 2) trial counsel was ineffective for a) not requesting a pinpoint instruction based on Campbell's subjective delusion that the victim was molesting his own children, and b) not requesting a limiting instruction on prior bad act evidence; 3) the trial court erred by limiting evidence showing Campbell believed the victim was molesting his children; and 4) the errors amounted to cumulative error requiring reversal.  The California Court of Appeal unanimously affirmed in a reasoned opinion.

Campbell raised these same claims in a counseled brief to the California Supreme Court, which the court summarily denied on May 13, 2009.

Campbell timely filed a *pro se* Petition for Writ of Habeas Corpus with this Court on October 15, 2009.  On February 23, 2011, this Court found portions of one claim to be unexhausted and ordered Campbell to file an amended petition containing only exhausted grounds for relief.  Following two unsuccessful attempts to amend his Petition *pro se*, this Court appointed

counsel to represent Campbell.  Campbell then filed a counseled Fourth Amended Petition on July 22, 2013.

## II. GROUNDS RAISED

In his Petition before this Court, Campbell raises the following claims: 1) "a series of instructional errors . . . deprived the jury of making any meaningful distinction between the *mens rea* requirements of first and second degree murder amounting to a directed verdict"; 2) trial counsel failed to request a pinpoint instruction informing the jury that Campbell's delusional belief that the victim was molesting his children was a relevant consideration at the time of the offense; 3) trial counsel failed to adequately object, make a record and/or request a limiting instruction on prejudicial character evidence introduced during the cross-examination of a defense expert; 4) the court erred in excluding state-of-mind evidence that would have corroborated Campbell's defense; and 5) the individual and cumulative effect of these errors denied Campbell due process.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings

of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Claim One: Instructional Errors

Campbell argues that the jury instructions wrongfully precluded the jury from reaching a

verdict of second degree murder.  He argues that the instructions given by the trial court

essentially amounted to a directed verdict, denying him his mental state defense and directing the

jury to conclude that if he committed murder at all, he committed first degree murder.  This

occurred, he argues, because the trial court: 1) did not define malice; 2) did not inform the jury

that his mental state defense may negate the elements of deliberation and premeditation as well as

malice; 3) allegedly redacted from the instruction's printed version that a decision to kill made

rashly or impulsively is not deliberate and premeditated; and 4) gave a short-handed definition of

second degree murder without defining malice.

The Court of Appeal concluded that the trial court committed no prejudicial error,

reasoning as follows:

> The obligation to instruct *sua sponte* . . . does not encompass what have come to
> be called pinpoint instructions.  Pinpoint instructions "relate particular facts to a legal
> issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken
> identification or alibi.  They are required to be given upon request when there is evidence
> supportive of the theory, but they are not required to be given *sua sponte*."
> In this case, there is no reasonable likelihood the instructions forced the jury to
> convict defendant of first degree murder.  From the instructions given and the arguments
> of counsel, the jurors would have understood that this was a case of whether [Campbell]
> committed murder with express malice, i.e., the specific intent to kill, and they would
> have understood the distinction between first and second degree murder.  The jurors
> would also have understood they could convict on second degree murder if they did not
> find the elements of deliberation and premeditation true.  To the extent [Campbell]
> believes that additional instructions were necessary for jurors to understand the

relationship of [his] mental state defense to those elements of first degree murder, he should have requested such a pinpoint instruction.

The jurors would have understood the concept of malice aforethought, and specifically express malice, because the trial court defined the concept when it instructed the jury with [Judicial Council of California Criminal Jury Instructions ("CALCRIM")] No. 3428.  The court told the jury the prosecution had to prove [Campbell] acted with the "required intent or mental state."  It defined the intent and mental state for murder as "the intent to kill in the mental state of malice aforethought."  Albeit clumsy, this definition told the jury the prosecution had to prove [Campbell] intended to kill.  This defined express malice because "express malice and an intent unlawfully to kill are one and the same."

Indeed, in closing argument the prosecutor acknowledged his burden to prove malice in the form of intent to kill, and he correctly labeled this malice as express malice. Defense counsel did not object.

Accordingly, the jury would have reasonably understood that to secure a murder conviction, the prosecutor had to prove [Campbell] harbored malice aforethought, and that to establish malice aforethought, the prosecutor had to prove [Campbell] intended to kill the victim.

The court's omission of CALCRIM No. 520's description of express and implied malice did not harm [Campbell] because the jury was instructed on express malice and there was no evidence to support an instruction on implied malice.  Striking a person in the head and neck with an ax several times under the circumstances of this case goes far beyond the type of dangerous behavior that demonstrates implied malice.  [Campbell's] actions demonstrated either intent to kill or, because of his mental state, no intent to kill nor knowledge that his act was dangerous to human life.  There was no evidence of implied malice.

In any event, as part of convicting [Campbell] of first degree murder, the jury determined that his attack on the victim was willful.  The trial court defined "willful" as acting with the intent to kill, the very definition of express malice.  ([California] Pen. Code, § 188.)  Having found that [Campbell] acted with express malice, the jurors necessarily would have made the same finding if they had been instructed with the CALCRIM No. 520 definitions of both express and implied malice.

Contrary to [Campbell's] claim, the trial court's failure to instruct on the distinction between express malice and implied malice in this instance did not eliminate the distinction between first and second degree murder or amount to a failure to instruct on a lesser included offense.  Unlike in the authority cited by [Campbell], the jury here could have reached a verdict of second degree express malice murder under the directions given by the court.  The instructions told the jurors to determine willfulness/express malice, deliberation, and premeditation.  If they found willfulness but not deliberation and premeditation, they were under instruction to convict on second degree murder.

[Campbell] calls the court's explanations of second degree murder "short-handed," but he does not challenge their correctness.  The CALCRIM instructions, following Penal Code section 189, required the jury first to determine if a murder occurred, and if so, to determine whether the murder was first degree or second degree.  If the jury could not

determine the murder was first degree, it became by definition second degree.  The court's short explanations of second degree murder as murder without deliberation and premeditation simply stated what the jury could already deduce from the court's definition of first degree murder.  This did not foreclose the jury from reaching a verdict of second degree.

The trial court committed no error when it did not relate, *sua sponte*, [Campbell's] mental state defense to the first degree murder elements of deliberation and premeditation.  A trial court is not obligated to instruct, *sua sponte*, on whether a preexisting mental condition precludes a defendant from deliberating or premeditating.  "[S]*ua sponte* instructions on the actual effect of [Campbell's] mental disease or disorder on his relevant mental state became unnecessary with the abolition of the mental disease/diminished capacity doctrine.  ([Pen. Code,] § 28, subd. (a).)"

Such an instruction is a pinpoint instruction, and it must be requested by the defendant.  Here, nothing in the record indicates [Campbell] requested the trial court to instruct the jury that his mental state defense could be applied to the elements of deliberation and premeditation.  Thus, there is no error.

[Campbell] claims the trial court instructed on his mental state defense by means of CALCRIM No. 3428, but it did so incompletely.  It informed the jurors they could consider his mental illness for the limited purpose of deciding whether he acted with malice, but it did not also inform the jurors to consider the illness when deciding if he acted with deliberation and premeditation.

Again, it was [Campbell's] burden to ask the court to expand on the instruction if needed.  "The trial court is not required to give such [a pinpoint] instruction on its own initiative, and if the instruction as given is adequate, the trial court is under no obligation to amplify or explain in the absence of a request that it do so.  [Where the instruction was adequate], and because defendant did not ask the trial court to clarify or amplify it, defendant may not complain on appeal that the instruction was ambiguous or incomplete."

Moreover, the court's rendition of CALCRIM No. 3428 was adequate in light of all of the other instructions the jury received, and it did not preclude the jury from reaching a verdict of second degree murder.  A trial court does not commit prejudicial error when it fails "to identify premeditation and deliberation as a mental state to which evidence of mental disease or defect was relevant, in cases where the trial court . . . explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder . . . ."

The trial court explained the elements of premeditation and deliberation as the mental state required for a finding of first degree murder.  A reasonable juror would understand that [Campbell's] mental illness, described as it was in the evidence, could have potentially impacted [his] ability to deliberate on his actions.  A reasonable juror thus would have linked the mental illness defense to the "mental state required for this crime," including deliberation and premeditation, and thus could have concluded the mental illness negated those elements.

The court again addressed [Campbell's] mental state defense as it applied specifically to the elements of first degree murder when the court told the jury a decision to kill made rashly, impulsively or without careful consideration was not deliberate and

premeditated.  This instruction accounted for [Campbell's] theory that, at most, he was
guilty of second degree express malice murder for acting impulsively due to his mental
illness.  [Campbell] claims this instruction was redacted, but it does not appear to have
been.  The court read the instruction, defense counsel argued the instruction, and the
printed instruction legibly included the language.

      Expert testimony suggested [Campbell's] mental illness could make him react
impulsively, to the point of not even knowing what he was doing.  From this testimony,
the jury could have concluded under the instructions given that [Campbell] did not act
with deliberation and premeditation when he killed the victim as a result of his mental
illness, and thus could have reached a verdict of second degree murder.  There is no
reasonable likelihood the jury did not understand the impact of [Campbell's] mental health
defense and its potential to reduce the crime to second degree murder.  We thus find no
prejudicial error in the court's rendition of the murder instructions.

A challenged instruction violates the federal constitution if there is a "reasonable
likelihood that the jury has applied the challenged instruction in a way that prevents the
consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380
(1990).  The question is whether the instruction, when read in the context of the jury charges as a
whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471
U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary
that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);
*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the
law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the
subject in depth).

The United States Supreme Court has expressly declined to decide whether due process
requires lesser included instructions to be given in non-capital cases, *Beck v. Alabama*, 447 U.S.
625, 638 n.14 (1980), and the Ninth Circuit has declined to extend the holding of *Beck*, which
requires lesser included offense instructions supported by the evidence in capital cases, to non-
capital cases, *see Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (the "failure of a state court

to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding" (quoting *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).   Although a criminal defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case, *Bashor*, 730 F.2d at 1240, that was not the case here.   Reading the instructions in their entirety, the Court of Appeal did not unreasonably conclude that the instructions given did not preclude the jury from finding that Campbell did not act with deliberation and premeditation when he killed the victim as a result of his mental illness, and thus could have reached a verdict of second degree murder.   Campbell is therefore not entitled to relief on this claim.

Claims Two and Three: Ineffective Assistance of Counsel

      A. *Strickland* Standard

      To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.   466 U.S. 668, 687 (1984).   A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.*   The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.   *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.   Thus, Campbell must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,*

474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make

a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts

may consider either prong of the test first and need not address both prongs if the defendant fails

on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because
> the *Strickland* standard is a general standard, a state court has even more latitude to
> reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

B. Failure to Request Pinpoint Instruction

Campbell argues that counsel was ineffective for failing to request a pinpoint instruction

on the effect of delusion on the elements of deliberation and premeditation.  He claims that

defense counsel should have requested an instruction that Campbell's belief that Larry was

molesting his children "constituted the kind of heat of passion or other mental state that would

have negated the intent element of first degree murder and reduced the offense to second degree

murder."

The Court of Appeal disagreed.  The court noted that the trial court denied Campbell's

request for an instruction on the lesser included offense of manslaughter on the ground that there

was insufficient evidence to support it.  Defense counsel did not assert in summation that

-14-

Campbell acted out of provocation or heat of passion as a result of his delusion that Larry was molesting his children.  Rather, defense counsel argued that Campbell's bipolar disorder prevented him from forming malice and that the circumstances of the crime indicated he did not deliberate before killing Larry.  The Court of Appeal concluded that Campbell failed to establish prejudice because, even if a pinpoint instruction had been given, it was not reasonably probable that Campbell would have received a more favorable verdict.   Although evidence of hallucination or delusion may be admitted to show that a defendant acted out of heat of passion and thereby negate the first degree murder elements of deliberation and premeditation, there was no evidence that Campbell in fact acted in the heat of passion without deliberating or premeditating.  Rather, the evidence suggested that Campbell's asserted delusion "existed well before [he] committed the homicide and did not foreclose his ability to plan his actions." Campbell accused Larry of molesting his children the day before the murder when he caught Larry masturbating in front of his five-year-old child.  Campbell chastised Larry, explaining that this is what had happened to him as a child, and also hit Larry in the eye.  "There is no doubt, based on [Campbell's] own comment, that at that moment, he believed the victim was molesting children."

Nevertheless, Campbell was not immediately provoked to kill Larry.  Instead, he removed the child from the room and returned to hit Larry in the eye.  The Court of Appeal concluded that "[t]he delusion did not on this instance prevent [Campbell] from planning his actions." Moreover, the following day, Campbell went out to retrieve the ax himself, warned the children to stay outside, and went to Larry's bedroom, where he gave Larry a moment to make a "nonthreatening comment."  Campbell ultimately struck Larry in the head and neck more than

once.  In addition, Campbell claimed to have seen his childhood abuser four days before the incident, but took no action at that time.  The Court of Appeal concluded that, when viewed in their entirety, the circumstances of the crime indicate that the verdict would not have been different even if a pinpoint instruction on the effect of delusion had been requested and given. "The evidence showed that despite the alleged delusion, [Campbell] planned and weighed his actions in a manner that constituted premeditation and deliberation."

The Court of Appeal's determination that counsel's failure to request such a pinpoint instruction did not prejudice Campbell's defense is not contrary to or an unreasonable application of federal law.  There was insufficient evidence to support the conclusion that Campbell acted out of heat of passion where the alleged delusion began before he committed the homicide and did not preclude him from planning his actions.  Even if trial counsel had requested the instruction, it is not likely Campbell would have received a more favorable verdict given the lack of evidence that Campbell acted in the heat of passion.  Campbell is therefore not entitled to relief on this claim.  *Strickland*, 466 U.S. at 697 (an ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs).

C. Failure to Object/Request a Limiting Instruction

During the guilt phase, Dr. Rogerson, a psychiatrist testifying for the defense, stated that Campbell's psychiatric illness and traumatic stress he suffered as a result of being molested as a child would likely affect his ability to form intent to commit the crime.  On cross-examination, the prosecution sought to impeach Dr. Rogerson's opinion based on his failure to consider a number of prior acts committed by Campbell and reported by witnesses to peace officers. Defense counsel objected to the second of these questions on grounds of relevancy, which the

trial court apparently addressed at an unreported bench conference.  Questioning in this vein continued extensively.  On redirect, Dr. Rogerson testified that the statements brought to his attention on cross-examination were consistent with his diagnosis of Campbell.

In summation, the prosecution did not mention Dr. Rogerson's opinion or the prior bad act evidence introduced on cross-examination.  In his closing argument, defense counsel accused the family witnesses of lying, stating specifically with respect to the allegation that Campbell had beaten Debra: "That didn't happen.  That didn't happen, the kids, and you know it didn't happen because if it had, . . . Campbell wouldn't have been there.  He would have been gone on a little parole violation . . . ."

In rebuttal, the prosecution stated that the jury would receive a limiting instruction on how they could use the prior bad acts evidence.  The prosecution noted that defense counsel had claimed the family members were lying, and clarified that the statements were "only offered for [Dr. Rogerson's] diagnosis, and it doesn't mean that [the events as reported by family members] actually happened."  The prosecution further stated that it was not using the bad acts evidence for the purpose of establishing a propensity toward violence, and that there was no "actual evidence that [the reported events] occurred one way or the other."  The court did not give a limiting instruction, and there is no evidence that defense counsel requested one.

Campbell argues, as he did on direct appeal, that trial counsel rendered ineffective assistance when he failed to object to, and request a limiting instruction against, hearsay testimony of his prior bad acts and incriminating statements used to impeach Dr. Rogerson. Campbell asserts that the admission of the statements was "inflammatory and prejudicial in the extreme" because it portrayed him as a "violent, controlling, kitty-killing maniac."

The Court of Appeal denied Campbell relief on direct appeal, concluding that under state law an expert's credibility may be challenged by inquiring about relevant information, including hearsay, which the expert may have overlooked or ignored.  The court could "perceive no explanation" for why defense counsel failed to request a limiting instruction, but nevertheless concluded that counsel's failure to request or the court's omission to instruct *sua sponte* was "effectively mitigated, if not corrected" by the prosecution's statements in rebuttal.

 Under California Evidence Code § 721, an expert witness may be cross-examined as to "the subject to which his or her expert testimony relates," and "the matter upon which his or her opinion is based and the reasons for his or her opinion."  "[A] party seeking to attack the credibility of an expert may bring to the attention of the jury material relevant to the issue on which the expert has offered an opinion on which the expert was unaware or which he did not consider.  The purpose and permissible scope of impeachment of an expert is to call into question the truthfulness of the witness's testimony."  *People v. Bell*, 778 P.2d 129, 145 (Cal. 1989); *see People v. Hughes*, 27 Cal. 4th 287, 334-35 (Cal. 2002) (trial court did not abuse its discretion in allowing cross-examination of psychiatric expert on defendant's prison record to undermine expert's opinion that defendant had maintained steady employment).  The prosecution's questioning of Dr. Rogerson was thus permissible under state law, although an objection on the ground that the questioning was substantially outweighed by the danger of undue prejudice, confusing of the issues, or of misleading the jury, might conceptually have been sustained.  *See* CAL. EVID. CODE § 352.

This Court is not certain of what occurred at the trial level because the bench conference in response to defense counsel's objection on the ground of relevancy was not reported.  In any

event, the prosecution did not discuss the prior bad acts evidence except to direct the jury that the

evidence was admitted for the sole purpose of evaluating Dr. Rogerson's medical opinion of

Campbell and was not and should not be used to establish Campbell's propensity toward

violence.  Any deficient performance of the part of defense counsel in failing to properly object or

request a limiting instruction was therefore not prejudicial to Campbell.  As the Court of Appeal

noted, a request for a limiting instruction would have had no effect on the verdict, and even if the

court had so instructed the jury, it is not likely that Campbell would have received a more

favorable verdict.  *Strickland*, 466 U.S. at 697 (an ineffective assistance of counsel claim should

be denied if the petitioner fails to make a sufficient showing under either of the *Strickland*

prongs).  Campbell is therefore not entitled to relief on this claim.

Claim Four: Exclusion of State of Mind Evidence

Frank Castleman, Campbell's neighbor, testified that on the day of the homicide,

Campbell came over to see him.  Campbell was upset, and told Castleman that he had been

molested when he was younger.  Defense counsel asked Castleman if Campbell told him about

concerns Campbell had about things that were happening at his house.  Castleman stated that

Campbell told him he thought the victim was molesting his children.  The court struck

Castleman's answer on the ground that it was hearsay.  Defense counsel argued that it was

admissible under California Evidence Code § 1250 as evidence of Campbell's state of mind, and

that it was not being offered for the truth of the matter asserted.   The court rejected defense

counsel's argument, concluding "[i]f it's not for the truth then it's irrelevant."

On direct appeal, Campbell argued that the trial court committed prejudicial error when it

refused to allow Castleman to testify that Campbell told him that he believed the victim was

molesting his children.  The People conceded that the testimony sought to be elicited was not

hearsay because it was proffered as circumstantial evidence of Campbell's state of mind and not

for the truth of the matter asserted.  The People argued, however, and the appellate court agreed,

that the error was harmless because Dr. Rogerson testified that Campbell told him that he

believed that the victim was molesting his children.  "Thus, the jury understood [Campbell's]

state of mind, and Castleman's testimony would have been only cumulative."

The Ninth Circuit has held, however, that "[w]here a trial court commits an evidentiary

error, the error is not necessarily rendered harmless where there was other, cumulative evidence

properly admitted."  *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *Krulewitch v.

United States*, 336 U.S. 440, 444-45 (1949) (holding that, in a close case, erroneously admitted

evidence—even if cumulative of other evidence—can "tip[] the scales against [a] petitioner");

*Hawkins v. United States*, 358 U.S. 74, 80 (1958) (concluding that erroneously admitted evidence,

"though in part cumulative," may have "tip[ped] the scales against petitioner on the close and

vital issue of his [state of mind]")).  Here, however, the trial court's error did not have a

substantial or injurious effect or influence in determining the jury's verdict.  *Fry v. Pliler*, 551

U.S. 112, 116 (2007).  Even if defense counsel had been permitted to introduce additional

evidence of Campbell's belief that Larry was molesting his children, Campbell's delusion did not

prevent him from planning his actions.  Rather, the circumstances of the crime showed that

despite his alleged delusion, Campbell planned and weighed his actions in a manner that

constituted premeditation and deliberation.  Campbell therefore cannot prevail on this claim.

Claim Four: Cumulative Error

Finally, Campbell argues that the four alleged errors addressed above individually and cumulatively denied him his right to due process.

The Court of Appeal denied Campbell relief on direct appeal, concluding that the errors complained of were harmless, whether viewed individually or cumulatively, and that Campbell received a fair trial.

"[T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle*, 505 F.3d at 928 (citations omitted). The "fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense far less persuasive and thereby had a substantial and injurious effect or influence on the jury's verdict." *Id*. (citations and internal quotation marks omitted).

Here, none of the alleged errors rendered the defense less persuasive or influenced the verdict. As discussed *supra*, Campbell voluntarily confessed to killing Larry, and thus the only question before the jury was whether he was guilty of first degree murder or a lesser crime. Contrary to defense counsel's assertion, there was no evidence that Campbell acted in the heat of passion. In addition, the circumstances of the crime indicate that Campbell was able to deliberate and premeditate before committing the homicide, in spite of his mental illness, his encounter with his childhood abuser, and his belief that Larry was molesting his children. It is not likely that the verdict would have been in Campbell's favor even if the trial court had not committed any of the alleged errors discussed above. Campbell is therefore not entitled to relief on this claim.

V. CONCLUSION

Campbell is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Fourth Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327 (2003)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 27, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge